## GOLDSCHMIDT THERMIT CO. v. PRIMOS CHEMICAL CO.

(Circuit Court of Appeals, Third Circuit. July 5, 1923. Rehearing Denied October 4, 1923.)

No. 2988.

1. **Patents ⬤⇒328—578,868, for method of producing metals, held valid and infringed.**
    The Goldschmidt patent, No. 578,868, for method of producing metals and alloys from metallic compounds containing oxygen, sulphur, or chlorine, consisting of finely pulverizing the compound, mixing it with finely pulverized aluminium, and heating a small portion of the mixture to initiate reaction, *held* valid and infringed.

2. **Patents ⬤⇒99—Specification to be read as addressed to those skilled in the art.**
    Specification of patent is addressed to those skilled in the art, and must be so read.

3. **Patents ⬤⇒229—Aluminium and metallic compound held "finely pulverized," within meaning of patent.**
    Patent for method of producing metals and alloys from metallic compounds, consisting in "finely pulverizing" the compound and mixing it with "finely pulverized" metallic aluminium, *held* infringed, where very thinly flaked aluminium and metallic compound, first crushed into dust and then cindered into lumps, were used.

4. **Patents ⬤⇒229—Process for treating "metallic compounds containing oxygen" held infringed.**
    Patent for method of producing metals and alloys from "metallic compounds containing oxygen" *held* infringed, where vanadium oxide, consisting of vanadium in chemical combination with a base metal and oxygen, was used.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit by the Goldschmidt Thermit Company against the Primos Chemical Company for infringement of patent No. 578,868, issued to Hans Goldschmidt for a method of producing metals and alloys. From a decree of dismissal, plaintiff appeals. Reversed and remanded, with instructions.

Livingston Gifford, Charles F. Dane, and Hubert E. Rogers, all of New York City, for appellant.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Synnestvedt & Lechner, of Philadelphia, Pa. (Paul Synnestvedt and Harvey L. Lechner, both of Philadelphia, Pa., and Clarence D. Kerr, of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. [1] It may be said of metals generally that in their natural state they are combined with other elements, usually oxygen, and their reduction can be effected by the use of carbon, because of its affinity for oxygen. In the case of iron, the carbon comes in contact with the ore, with the result that some of the carbon remains with the metal as an impurity. But such impurity is, in the ordinary use of iron, not objectionable. In the case of other metals, where such impurities would be objectionable, they were avoided by placing the ore to be treated inside of, and the fuel outside of, a crucible or retort. These two general practices were in long and general use in that art. As the call for various refractory metals, such as ferrovanadium, chromium, or manganese, grew, it was found the desired standard was a carbon free product. But even the electrolytic process did not yield such a product, and it was recognized that some new method must be found to secure one. This situation was testified to by Professor Goldschmidt as follows:

"About the year 1894 the well-known and celebrated Krupp Works in Essen, manufacturer of guns and armor plates, asked me if it would be possible for me to manufacture on a large scale chromium and manganese free from carbon. * * * This [electrolytic] process of Krupp had no success. I tried in my factory laboratory another electrolytical process for making chromium, but also not with satisfactory success."

Goldschmidt later visited, at London, Vautin, a great metallic expert, to learn what use he had made of aluminium. He found Vautin was making metallic manganese in small quantities by mixing a few ounces of oxide of manganese with finely pulverized aluminium in a three or four inch earthenware crucible and surrounding it with a coke fire. The reaction of aluminium under heat, and to which reaction we shall hereafter refer, was well understood; but it will be observed no other practice to bring aluminium to the reaction stage was then used, save by external heat conveyed through the wall of the crucible, as above described. With this knowledge in view, but with the problem intrusted to him unsolved, Goldschmidt returned to Essen and began experiments, as to which he testified as follows:

"When I came back to Essen, the end of July, 1894, I was very anxious to try these [Vautin] reductions, especially with oxide of manganese and oxide of chromium, on a larger scale, and I started first with oxide of manganese, as this oxide was more easily available during the first time. I made very numerous experiments with outside heating from July until November, 1894. I used pretty large crucibles of one and a half feet high, coated with magnesia (oxide of magnesium). The crucibles were prepared with iron wire outside in many cases. I put three of these large crucibles in an open coke fire, which I placed in the yard of the works. A very violent reaction set in, and, though I changed the conditions of the experiments, I found out that this process was totally impractical for different reasons. * * * First, the violence of the reaction; second, spilling more or less of the contents of the crucible during the reaction; third, the breakage of the crucible by the in-

tensity of the heat developed from both the inside and outside; and, fourth, the fact that the product was not pure."

The proof was that, thus traveling on the path outlined by Vautin and using his process on a larger scale, Goldschmidt entirely failed, as the product was not uniform, amongst other reasons, because it contained too much silicon, due to the magnesia lining of the crucible not being able to stand the violent reaction of the aluminium; to the fact that the violent aluminium reaction caused the metal to fly out of the top of the crucible and become lost in the coke fire. But out of these experimental failures came the invention which so great an authority as Professor Chandler testified, under oath, in words seldom used in scientific circles and hereafter quoted, that Goldschmidt's invention was a miracle. We here quote Professor Goldschmidt's own account of the evolution of his invention:

"Now the thought occurred to me that, by igniting the mixture internally at one point or place, *avoiding external heating altogether*, it would be possible to overcome all the above-mentioned difficulties. I thought it over, how I could do this practically. As I knew that certain metal compounds, such as oxide of manganese, gave a very lively and energetic reaction, I of course did not use for my first experiments the manganese compound, as an explosion might occur and I might lose my eyes. I therefore selected for my first experiment in this regard oxide of chromium, as I knew that this reacted less violently. I charged a crucible of medium size with a mixture of oxide of chromium and aluminium and applied an ordinary blowpipe (such a blowpipe as is used in a laboratory for heating small crucibles and for glass-blowing work) directly to one point of the surface of the mixture. I found that, upon igniting the mixture at this point, the ignition spread *without external heating* throughout the whole mass, and I found that this reaction was *thoroughly quiet*, and that there was no eruption or explosion, even if I used mixtures such as oxide of manganese with aluminium, oxide of iron with aluminium, oxide of nickel with aluminium, etc., which gave, *heated from the outside*, very strong reactions, eruptions, and explosions. I found out that not only the reaction started in the cold mixture and went through the whole mass; I found also that after the reaction was finished a reguline separation took place, and *that the help of outside heating was totally unnecessary*. So I could very soon go on producing larger reguli of manganese, as well as chromium. In the course of November, 1894, I made larger buttons of manganese and chromium, weighing between 16 and 25 kilos, so that I was able to give, soon after, the first samples. I then tried other means of ignition in place of the blowpipe. I found out that a mixture of peroxide of barium compound with aluminium was especially practical, and later I glued this mixture together with a solution of shellac in alcohol, putting in a wire or a small ribbon of magnesium, so this constituted an igniter and looked like a cherry, and was called the 'ignition cherry.' * * * In this way I discovered that the violent reaction could be reduced to a quite smooth and even one. I practically did not use any crucible at all; the magnesia lining of any vessel was good enough; as heat from outside was not applied, the magnesia was not attacked through the violence of the reaction, as there was no violent reaction any more. I found out that, without heating the mixture, a pure regulus, with nearly theoretical output, was possible; that I did not need a furnace, a chimney, *nor fuel*. I went on to experiment with this principle of internal heating upon other metal compounds, and found that it was practically universal for all the metals which could be reduced with aluminium in the prior art."

A study of the proofs and patent satisfied this court that the soul, so to speak, of Goldschmidt's disclosure, and therefore the governing factor in a just construction and application of its claims, lay in the

new use he made of aluminium reaction.  The fact of such reaction, its heat-producing capacity, and the grain conditions under which it reacted, were all known; but Goldschmidt made a wholly new use of such reaction, and this he did by an initial, internal ignition.  What he did physically was simply to take old elements, the crucible, aluminium grains, and aluminium reaction, and use those elements in a novel way. The physical part was simply to light a small, primary ignition zone, located inside the crucible; but that small, internal zone of primary ignition instantly leavened and permeated the contacted secondary aluminium zone, and at once the whole aluminium mass passed into a quiet reaction—a new result—with the striking process results following:  First, Goldschmidt did away with the use of all fuel, the aluminium reaction self-producing the intense heat required; second, Goldschmidt did away with the violent ebullition of aluminium reaction, incident to former use, and effected a gentle reaction; which, in turn, third, did away with the metal waste which made the prior use of aluminium reaction noncommercial; fourth, by doing away with the aggregate heat incident to the old practice, due to fuel heat from outside the crucible and the violent aluminium reaction heat inside, Goldschmidt not only avoided the violent eruption incident to this duplex heat, but by his single, quiet, internal heat-use practice he so reduced the heat attack on the manganese lining of the crucible as to get a practically carbon free product, which was impossible under the double heat process.

Without entering into the proofs, it suffices to say that Goldschmidt's disclosure at once challenged the attention of the metal industry; it was sensed as a radical and revolutionary step; it was regarded as creating a new metallurgy of chromium and manganese; its principles and practice were discussed by and before scientific bodies, lectured upon in schools and universities, and it at once earned for itself a technical name, "the alumino-thermic process," a recognition by the art of its distinctive novelty and its substantial worth.  Without adverting to the references to, discussions of, and appreciation by the writers of various technical treatises, we restrict ourselves to quoting from Turnowsky's Der Techniker, Breslau, 1901:

"It was left to the Goldschmidt alumino-thermic process to produce and make use of, for technical purposes, high temperatures up to 3,000° by means of the reduction of metal oxides by aluminium."

Scholl's Electro-Chemical Industry, vol. 1 (N. S.) p. 175:

"It was left to Dr. Hans Goldschmidt, Essen, Germany, to find out the means by which to temper the violence of reaction and to evolve what is now known as the Goldschmidt process."

And the terse summary of Ostwald quoted approvingly in Heinrich's The Chemical Industry, "It is a smith's fire and a blast furnace in the waistcoat pocket."  Like other great inventions, its greatness consists in its simplicity, occupying, as it thus does, a strategic position and a dominating entrance to an important branch of the metal industry. Accordingly, it appeals with large equity to courts for such construction and adjudication as will insure, for a reasonable time, the exclusive use of the great contribution which, in due time, the public

will be free to enjoy. In consequence, we find such has been the view of courts before which this patent has come.[1] The invention at once came into general use, and with the exception of an unusually small number of infringers—all of whom have been enjoined—the patent has been respected by the art.

Moreover, it is to be noted that Goldschmidt's discovery was radical in character, and was not a step predicated on accepted theories or practice. This is clearly pointed out in the testimony of Professor Chandler as follows:

"There are several reasons why Dr. Goldschmidt's process would not be obvious. In the first place, it is clear that, if the reaction is to spread, the amount of heat given out at the starting point must be sufficient, not only to heat the adjacent particles, but to raise them to the temperature at which the reaction takes place. This temperature was known to be extremely high. Immediately the reaction started at a point, heat would be rapidly withdrawn—first, by radiation into space; second, by convexion by the atmosphere; third, by conduction by the surrounding mixture—aluminium being a good conductor and having a great capacity for heat; that is, specific heat. So only the balance of the heat would be available for producing the critical temperature in the surrounding mass. Further, at the high temperature of the reaction, the losses by radiation, convexion, etc., are extremely rapid. Aluminium is a metal of high capacity for specific heat. It requires more heat to raise it to a given temperature than any other common metal, and its capacity for heat increases with its temperature. Its heat of fusion is also very high, and fusion seems to be a necessary antecedent to its reacting. Aluminium is notoriously difficult to fuse. I have heard that mineralogists use a thin plate of aluminium as a support in blowpipe analysis in place of platinum. Of course, it is cheaper; but it is sufficiently difficult of fusion to answer the purpose in many cases. It is quite obvious, therefore, that unless the reaction propagated itself through the cold mixture with a great and hitherto undetermined velocity it would simply be chilled off whenever the source of heat was removed.

"But the invention does not consist in merely applying a light to the mixture; it consists in heating a small portion to initiate the reaction as set forth, and the method set forth is of a very special character. If a lighted match or a gas flame be applied to ordinary thermite, the reaction does not start, although in each case the hottest part of the flame is well above the reacting temperature. Thermite cannot be ignited by means of a red-hot poker. If thrown upon a fire, it may extinguish the latter without being itself ignited. Experiment and observation must have been required before the in-

1 See the comprehensive and able discussion of Goldschmidt's patent by Judge Haight in Goldschmidt Thermit Co. v. American Vanadium Co. (D. C.) 291 Fed. 81, wherein he says: "Vautin, as well as others, had discovered the aluminium reaction. He and they adopted the conventional way of starting it. But unquestionably this method had its disadvantages, which were real and substantial. Goldschmidt discovered the internal ignition of a small portion, and thus the means of making the reaction commercially useful. True, he, providing a different method of initiating the reaction, made in one sense merely an improvement on Vautin; but in another sense he made a great step in advance. In the latter sense he is not to be considered as one who has made a mere improvement on an existing process, and thus entitled to a monopoly only in respect to the particular form which he described. The law affords him a range of equivalents commensurate with the degree of his invention. Paper Bag Patent Case, 210 U. S. 405, 415." See, also, opinion of Mr. Justice Warrington, High Court of Justice, Chancery Division (24 Patent Design and Trade-Mark Cases, 441) where he says: "With regard to prior user there is no evidence of internal heating having been employed to produce the temperature of reaction, and this defense, therefore, also fails."

ventor conceived the essential principle, namely, that the means for ignition must produce locally and at once a sufficient supply of heat at an extremely high temperature, so as to overcome losses by radiation, etc., and avoid heating up adjacent portions of the mixture. The blowpipe flame, magnesium band, and the igniting mass (preferred) are characterized by producing an extremedy high temperature, exceeding the temperature of ignition. This insures that the reaction will start at once before any adjacent portion becomes materially heated.

"Before leaving this subject, I will refer to the fact that the traditions and experience of the metallurgist taught him that in order to accomplish satisfactory results in operations requiring high temperature, especially when operating with such refractory materials as the process of Goldschmidt was designed to handle, it was eminently important that a moderate sized crucible should be employed, and that these crucibles should be so placed in suitable furnaces that they would be enveloped by the fuel. I will give one or two quotations in support of this statement:

"In Knight's American Mechanical Dictionary, volume I, Boston, 1882, I find the following statement on page 652: 'In use crucibles should be placed in the fire, and not on it. The fire should surround the crucible to the very top, and a blast, if used, should not strike the crucible direct. They should be kept in a dry place, the least dampness being fatal. For melting brass, copper, gold, silver, or alloys of metals, a Dixon graphite crucible should run from 20 to 40 meltings, according to the fuel, draft, care, or other circumstances. For melting steel they will run from four to six times, and longer by a systematic cleaning the slag from the surface after each melting, and coating the crucible with a mixture consisting of fire clay, graphite, charcoal, and pure, fine quartz sand.'

"This quotation illustrates the traditions of the metallurgical art in bringing about chemical reactions by the aid of heat, and it never occurred to any one of the distinguished chemists and metallurgists who studied and experimented with aluminium that any such miracle could even be brought about as putting a charge of pulverized aluminium and a metallic oxide in a cold crucible to the extent of 100 or 200 pounds while it was standing out in the open on the floor, without any fire in sight, and touching it off with a match, having the reaction over in a minute, and getting a yield of 100 or 200 pounds of a refractory metal like chromium, and yet it was what Goldschmidt has done."

[2] Finding, as we do, the patent valid, we next turn to the question of infringement. That question has been made to largely center on the words "finely pulverized metallic aluminium," found in the claim, and aluminium "in a finely pulverized state," found in the specification; but in our view these terms must not be considered as the sole criteria of infringement, but must be regarded, not apart from, but in connection with, Goldschmidt's disclosure as a whole, for it is quite apparent that Goldschmidt made no invention or new disclosure of finely pulverized aluminium. He simply took the aluminium in the pulverized state of the old art, but without success, and used that old material, with the known reaction which aluminium produced, in a new way. This is quite clear when the specification is studied. That document is, of course, addressed to those skilled in the art, and it must be so read. It begins with the general statement of the use of aluminium as a fluxing agent, and without specifying any degree of pulverization it states:

"If metallic compounds which contain oxygen, sulphur, or chlorin—for instance, oxides, sulphides and chlorides—are heated with aluminium, the respective metal is separated."

From which, of course, the art would know that by this statement was meant aluminium of the character which would, under proper

heat, respond to reaction. It may therefore be assumed that Gold-schmidt's invention was addressed to aluminium used in any condition that would respond in reaction when subjected to proper heat condi-tions. The specification then proceeds:

"The aluminium should be employed in a finely pulverized state if the result is to be a success, and when the mixture of the pulverized aluminium and the compound to be reduced is heated up to the point of fusion there occurs a very energetic reaction. In consequence of the vehemence of the latter a certain quantity of the material is thrown out of the crucible before the reduction is finished, and that quantity, as well as the fuel consumed for heating the same, is lost for the useful effect of the process."

This is the only place in the specification where mention is made of pulverizing, and it will be observed that in this extract, taken as a whole, Goldschmidt is here referring to the difficulties of the old art, for the disclosure of his own invention does not begin until the next following paragraph is reached. So considering, Goldschmidt in this paragraph states that, if you want to have adequate aluminium re-action in such present practice, you use finely pulverized aluminium. This is clearly what is meant by the initial sentence, viz.:

"The aluminium should be employed in a finely pulverized state, if the result is to be a success, and when the mixture of the pulverized aluminium and the compound to be reduced is heated up to the point of fusion there occurs a very energetic reaction."

In fact, this sentence says, to get the reaction under old practice, you use finely pulverized aluminium to succeed; but, he adds, this pro-duces a very energetic reaction. He then states what ensues from this use of fine pulverized aluminium in the old process, viz.:

"In consequence of the vehemence of the latter, a certain quantity of the material is thrown out of the crucible before the reduction is finished, and that quantity, as well as the fuel consumed for heating the same, is lost for the useful effect of the process"

—language which is only applicable to the old process. He then pro-ceeds to describe his own new process, and therein he refers to "pul-verized aluminium" as follows:

"The purpose of my invention is to, overcome described deficiencies, and I attain that object by causing the reaction to set in, not throughout the whole mass at a time, but only at one point or place of the mass. In other words, I initiate the reaction at a certain point or place of the mass, and then cause it to proceed from the respective portion *of the mass to the other or main portion of the same.* Said initiating of the reaction may be performed, for instance, by igniting the mixture of pulverized aluminium and one or the other of the compounds aforementioned (or, more precisely, a small portion of that mixture) by means of a blow flame directed against that portion, or by means of a piece of sheet or band magnesium that is put into that portion and is then ignited. * * *

"The igniting mass may either be loosely strewn upon the material or mix-ture to be put in reaction, and may be ignited by a magnesium band or by a match, or it may be formed into balls or similar bodies by means of pressure, or by aid of a suitable cementing medium, and a magnesium band may then be put into each of said balls or bodies. The latter are slightly pressed down upon and into the material or *mixture to be put in reaction,* and when ignited they transfer their own reaction easily upon said material or mixture. The reaction of the latter may be continued by adding fresh material to that

contained in the crucible, and I prefer to press said fresh material into the shape of cubes, prisms, and the like."

As we have said, this specification is addressed to those versed in the art, and who would take the new disclosure and apply it to the elements of the old practice and process they knew; for instance, there is nothing expressly said by Goldschmidt, in describing his process, that it is to be used in a crucible, but since he described the old process in the first extract cited as one where "a certain quantity of the material is thrown out of the crucible," and since in the record extract quoted his purpose is "to overcome described deficiencies," it is evident Goldschmidt took the tools and materials of the old practice, and used them in such a different way that metal was not thrown out of the crucible, but, as stated in his specification, enabled him "to produce refractory metals, such as chromium, manganese, and the like, in large quantities and on a commercial scale," and this, of course, was to be done by adding the batch intended to be treated after adequate reaction was established, of which added batch the specification says:

"The reaction of the latter may be continued by adding fresh material to that contained in the crucible."

It will thus be seen that the gist of Goldschmidt's disclosure was to take the pulverized aluminium of the old art, place it in a crucible, there ignite a small portion, and allow that small portion to ignite a larger portion of contracting similar material, and by that means create an initial ignition of such intensity as would communicate itself to fresh material thereafter added, or, to use the words of the specification:

"The reaction of the latter may be continued by adding fresh material to that contained in the crucible."

It is, as we view the process, this initial ignition of the small mass and to the transference of such initial ignition to its contacted larger or secondary mass of similar material, the claim is addressed, viz.:

"The method of producing metals and alloys from metallic compounds containing oxygen, sulfur, or chlorin, *consisting in finely pulverizing the compound, mixing it with finely pulverized metallic aluminium,* heating a small portion of *that mixture* to *initiate* the reaction of said portion, without bringing the said portion out of contact with the remaining main portion, and letting the reaction then transfer itself to said remaining main portion, causing a continuation of the process by the heat developed by said initial reaction, as set forth."

In our judgment, the claim neither specifies, refers to, nor by construction can be extended to the subsequent step described in the specifications of feeding into the created zone of adequate heat the charges of material referred to in the words twice quoted above, viz.:

"The reaction of the latter may be continued by adding fresh material to that contained in the crucible."

Such addition of batch was not of the essence of the invention. It was simply the utilizing of the invention by feeding such material as it was desired to treat into a position where the reaction heat obtained by the invention could be brought into play upon such added mate-

rial. It was here we think the court below fell into error, in that it took the character of the added, to-be-treated batch as a test of the invention, instead of considering the invention as lying, not in the added material, but in the finely pulverized aluminium, by which, as we have above described, the desired degree of reaction—internal heat—was obtained by initial ignition of a small portion and transmission to the larger portion of contacting material. On the other hand, regarding the claim and invention as we do, that it covered the initial and transmitted ignition, it follows the character of the added batch becomes a matter of indifference, so far as the claim goes, and is only of importance in the fact that, whatever the size of its constituents, they were of such character as to respond to the heat conditions created by the ignition, reaction, and heat conditions of the prior stage, and, responding to such heat conditions as such added materials did, they would get the full benefit of Goldschmidt's invention; for in truth it would seem true as a physical fact that, as heat intensifies, the relative coarseness or fineness of the material attacked becomes of relatively less importance, for a big conflagration can burn up a fireproof building, when a small one would not affect it.

We next turn to the process of the defendant, premising that inquiry by the fact that the intensity of reaction is affected by the fineness of the materials. In that regard, James Otis Handy, the defendant's expert, says:

"The violence of the reaction between the aluminium and' metallic oxide depends upon the speed of the reaction more than on any other one factor. The speed of the reaction is dependent on the fineness and the intimacy of mixture of the two materials. There are no gases evolved which take fire and so carry on the reaction. The reaction has to travel from particle to particle, and naturally the finer the particles the more rapid the travel, and the greater violence in reaction, because all of the heat is generated in a much shorter space of time than it is if the reaction is slowed down by any means."

[3] In defendant's practice, a quantity of its mixture is placed in the bottom of a heated crucible, and reaction is started by the ignition of a small part, from which it extends through the rest of the mixture. The aluminium of such mixture consists of flakes, which the proofs show are from "six one-thousandths of an inch, which is a little thicker than the human hair," to "four one-thousandths of an inch," and when they are folded over, as some are, they measure "7¼ one-thousandths of an inch." Obviously the use of such thinly flaked aluminium for initial ignition is in purpose, action, and result the thermal and chemical equivalent of Goldschmidt's finely pulverized aluminium, for, as shown in the proofs, the flaking—

"causes the particles to offer more surface. It is equivalent to flattening out the particles of the powder into thin leaves, and causing them to offer more surface to the reaction."

[4] We are also of opinion that the vanadium oxide used in its mix by the defendant falls within the generic element, "metallic compounds containing oxygen," of Goldschmidt's claim, since it contains "vanadium in chemical combination with a base metal and oxygen." We are also of opinion that, so preliminarily prepared and as used in defendant's process, it is in function, action, and result the equivalent of the

"finely pulverized" requirement of Goldschmidt's claim. After being subjected to crushing, grinding, sieving, and precipitating processes, which need not be here detailed, it takes a dust form probably finer than could be produced by mere mechanical pulverization, and the subsequent cindering it into lumps in no wise changes its function of fulfilling all the purposes for which Goldschmidt's finely pulverized compound was used in the process of his claim. Falling, as defendant's initial ignition and transference of ignition to the contacting remainder of the mix does, under the terms of the claim of Goldschmidt's patent, and obtaining thereby, as defendant does, a reaction heat adequate for the successful treatment of further additions, we are of opinion infringement is shown, and the character of the materials later added cannot lessen or detract from the infringing already done, for the fact is that the defendant is able to successfully treat such material as it does at the last stage of its process, because it has infringed Goldschmidt's patent in the first stage of its process.

We are therefore of opinion infringement has been made out, and the plaintiff is entitled to a decree. In so holding, for the reasons above stated, we have not overlooked the other contentions made in the case—the preheating of defendant's crucible, the occasional ignition caused by crucible heat, the previous abandoned applications of Vautin, laches, the prior art, and other questions, including, of course, the challenge of the jurisdiction of the court below by reason of the bill having been filed so short a time before the expiration of the patent. We find nothing in these contentions to cause us to hesitate in entering the decree indicated as above, and on the question of jurisdiction we think the court below has amply vindicated its action in retaining jurisdiction in its opinions reported in 225 Fed. 774, 775, noting that, in addition to the considerations referred to in said opinions, there was the further fact that the patent had already been sustained in this circuit, and if the court below chose to make such sustaining of the patent sufficient prima facies of validity, the situation was one that involved no delay in its decision and grant of an injunction.

The cause will therefore be remanded to the court below, with instructions to vacate its decree, reinstate the bill, and enter a decree adjudging the patent valid and infringed, and ordering an accounting.