## ALUMINO-THERMIC CORPORATION et al. v. GOLDSCHMIDT THERMIT CO.

Circuit Court of Appeals, Third Circuit.
February 20, 1928.

No. 3558.

1. Patents ⊂═╸328—1,153,435, claims 1, 2, and 3, for method of uniting railway rails, held valid and infringed as to certain device, and not infringed as to others.

Lange patent, No. 1,153,435, claims 1, 2, and 3, for a method of uniting railway rails, *held* valid and infringed as to certain device, and not infringed as to other devices.

2. Patents ⊂═╸328—900,366, for process for uniting metals, held invalid as mere mechanical improvement.

Goldschmidt and Lange patent, No. 900,366, for a process for uniting metals, *held* invalid, as showing mere mechanical improvement, and not an inventive step.

3. Patents ⊂═╸328—1,075,709, for manufacture and use of ferroso-ferric oxide, held valid and infringed.

Goldschmidt patent, No. 1,075,709, for manufacture and use of ferroso-ferric oxide, *held* valid and infringed.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit by the Goldschmidt-Thermit Company against the Alumino-Thermic Corporation and others. Decree for plaintiff, and defendants appeal. Remanded, to modify decree.

For opinion below, see 25 F.(2d) 196.

Oliphant & Mitchell, of Trenton, N. J. (Albert M. Austin and Geo. W. Case, Jr., both of New York City, of counsel), for appellants.

Charles F. Dane, Newton A. Burgess, and Livingston Gifford, all of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This case concerns the use of alumino-thermic metal for welding. The workable method of commercially producing that remarkable product was disclosed in patent No. 578,868, granted March 16, 1897, to Hans Goldschmidt.

The present plaintiff became the owner of that patent, brought suit upon it, and its validity was sustained by this court in Goldschmidt Thermit Co. v. Primos Chemical Co., 292 F. 362, wherein will be found this court's estimate of the remarkable invention which Dr. Goldschmidt made, and by reference as well to Goldschmidt Thermit Co. v. American Vanadium Co. (D. C.) 291 F. 81, and Ther-

mit v. Weldite, 24 Patent Design and Trade-Mark Cases, 441, needless restatement of the general art is avoided. Dr. Goldschmidt's alumino-thermic metal went into extensive use in welding, and the patent monopoly of its use was enjoyed by the plaintiff company until the patent expired. On September 14, 1915, Felix Lange, assignor to the plaintiff, was granted patent No. 1,153,435, for a method of uniting railway rails, and in the court below such assignee brought suit charging the defendant with infringement of the three claims thereof. That court entered a decree adjudging such infringement, whereupon this appeal was taken.

The patent aptly describes the prior practice in welding railway rails; the objectionable features in such practice, which the patentee sought to overcome, the mode in which he did it, and the claims by which he sought to protect his disclosure. These are all so clearly set forth in the patent as to be self-explanatory. Without, therefore, resorting to the voluminous testimony in the record, we turn to the patent itself, to ascertain from it what he claimed he discovered, and what he disclosed, and for which his claims were granted. In the first place, he states that his invention is of "certain new and useful methods of uniting railway rails," and states that "the following is an exact specification" thereof. While ordinarily the title of a patent may be of no special significance, in the present case we note that in its passage through the office during its several rejections, as seen by the file wrapper, the substitution by the office of the phrase in the title of the patent a "method of uniting railway rails" for "uniting rails and the like," would seem to indicate the sphere of the invention, in its view.

Indeed, the prior extensive use of alumino-thermic metal in the branch of welding railway rails is conceded by the patentee, who, in describing such practice says in his specification: "In order to unite railway rails, an alumino-thermic welding method has been very widely practised, according to which method the rail ends were placed at a distance of about 15 to 20 millimeters apart and the intervening space was filled with iron produced by the alumino-thermic process." The objectionable feature in such prior practice, which it was his avowed purpose to change, Lange thus recites:

"This method of uniting the rail ends resulted in part of the rail ends being fused by the liquid iron poured into the intervening space aforesaid, so that in the joint obtained

the tread of the rail head was interrupted by a filling of alumino-thermic iron, the length of which was about 6 centimeters. Now, practical experience has shown that the intermediate piece of alumino-thermic iron generally becomes worn away to a greater extent than the rail itself. It has proved to be extremely difficult to make the resistance capacity or durability of the alumino-thermic iron filling equal to that of the rail itself, but this disadvantage is overcome by the present invention."

And the inventive method by which he does so is set forth so clearly as to leave no uncertainty. It will be observed he makes no change in the composition of the fusing agency or in the mold of the old art, for, as he states, he performs "the casting in the intermediate space in known manner"; but his single, individual, and only additional disclosed method consists, as he says, "in inserting into the space between the head portions of the rail ends an intermediate piece of the same material as that from which the rails are formed, and then performing the casting in the intermediate space in known manner."

Here, then, we have a single defined physical article, to wit, an inset insert, technically a "shim," of rail metal. It is to be inserted between the two separated individual rails at a certain place, viz. "between the heads of the rail ends," and when subjected to the alumino-thermic metal heat of the old practice, applied in the old manner, a novel, useful, and inventive product results, to wit:

"The improved method is carried out, for instance, in such a manner that a piece of metal of the same character as that from which the rails themselves are formed, and corresponding more or less to the cross-section of the heads of the rail ends, is inserted between the heads of the rail ends, which are rigidly placed and are afterward surrounded by a mold. * * * The iron flows around the intermediate piece of metal, and a perfect homogeneous union of the tread or head portion of the rail ends is obtained, and the said iron fills the remainder of the intermediate space between the rail ends. In this way it is possible to introduce into the tread, which is subjected to wear and tear by the rolling stock, a material which has a capacity for resisting such wear and tear, or a durability, equal to that of the rail itself."

But not only is this intermediate inset insert the one and only avowed and disclosed invention, but its form and function are described in the specification and illustrated in the drawing. Thus in the specification it is said: "To enable the mode of carrying the present invention into practice to be readily understood, reference is made to the accompanying drawing, which shows part of the section of a rail end which is to be joined to a similar rail end, together with the intermediate piece of metal which is inserted into the space between the end surfaces of the head portions of such rail ends."

The language in which the three separate and separated agencies are set forth, viz. first, "the intermediate piece of metal which is inserted into the space between;" second and third, "the end surfaces of the head portions of such rail ends"—is so clear, precise, and exact that the testimony of no experts can add to or detract therefrom. And this "intermediate piece" is illustrated in the single drawing. "The inserted piece b is somewhat of inverted L-shape, but other shapes may be used. In the example shown the piece b is of such a shape and is so disposed as to lie between the thickest portions of the heads of the rail ends, and so that its upper edge lies about flush with or a little above the plane containing the actual tread surface of the rails. Thus the intermediate casting of liquid iron is limited to the web and foot of the rail and to the outer parts of the tread or head of the rail."

It will also be noted that the invention had reference to the use of the insert, not between the entire cross end sections of the two rail ends, but only between the heads of the rail ends, in that the insert is described as "corresponding more or less to the cross-section of the heads of the rail ends," and such insert "is inserted between the heads of the rail ends." So, also, "the new or improved method of uniting rail ends consists in inserting into the space between the head portions of the rail ends an intermediate piece of the same material," etc. And as the *head* portions of the rail ends were thus specified as the sole points of rail contact with the inserted piece, and the inserted piece was of a size where it would contact only with the rail head, it is evident that the functional object of the invention centered at the heads of the abutting rail heads, and that the stem and base of the rail were matters of no moment in the practice of the invention, and that the aim of the patentee was to obtain a uniform homogeneous weld of rail metal in the tread of the wheel. That this was done by means of the insert between the heads of the rail ends, by placing the insert or intermediate gap between the rail ends, is clearly stated

by the patentee when, in closing his specification, he says: "It will be apparent from the drawing that there is no filling of cast metal in the actual tread surface, which prevents an unbroken wearing face of wear and tear resisting metal, owing to the presence of the upper edge of the metal piece $b$ in the gap between the two rail ends."

Indeed that this gap-filling cross-section, inserted between the heads of the two rail ends, was characteristic of and constituted the invention embodied in Lange's disclosure, and was the ground on which his application was based and issue of the patent sought, is shown by the contentions made by him in the Patent Office. The original claims and the amended claims were rejected by the Office. It was not until another amended set were filed that the patent was finally allowed. During such procedure Lange continually stated, as seen in the file wrapper, that the insert between the rail ends was what constituted his invention, saying:

"The main feature of the applicant's invention is that the metal piece $b$ is inserted only between the head portions of the rail, so that the foot and web portions of the rails, as well as the outer parts of the head portions may be fused directly together by the molten metal. * * * Where no shim was employed, and the union was obtained by pouring alumino-thermic iron in the intervening space between the rail ends, the tread of the rail head was interrupted by a filling of alumino-thermic iron, which did not possess the same wear-resisting qualities as the rails themselves, and therefore wore faster. As pointed out in the specification, it has proved extremely difficult in practice to make the durability of the alumino-thermic iron filling equal to that of the rail itself. By the present method a metallic piece is inserted, made of the same material as the rails themselves; said metallic piece being so positioned that it affords practically a continuous rail of the same material throughout and possessing the same wear-resisting qualities at the joints as well as at other parts. * * * The applicant inserts the metallic piece at a certain well-defined place with respect to the specific parts of the rail, to-wit, at the place where it is desirable to provide a good wear-resisting surface, and at such a place where the remaining adjacent faces of the rail ends can be fused directly together to provide a strong union."

The final result was the issue of the three claims printed in the margin,[1] into which, it will be noted, an element was the insert in such language as "inserting between the head portions only of the rails an intermediate piece of metal, etc.," and "fusing said piece of metal together with the rail ends," "whereby such metal piece is fused in position," etc. It will be noted, as heretofore stated, the specification describes no new form of mold or method of pouring, but explicitly says the casting is done "in known manner" and that the mold is one "having holes $d$ and $e$, one of which may act as a pouring hole, and the other as a riser in known manner." It will thus be seen that the disclosure of the patent was for a single specified method, to weld a single specified article, and to do such work at a specified point. The case, therefore, being one where no preferable or illustrative practice is shown, but where the disclosure is specific and aptly describes its single, unitary invention, the patentee is awarded all he disclosed and claimed if given a monopoly of such particular method. So holding, we turn to the four forms of alleged infringement.

[1] What we shall call the No. 1 infringement shows the use of a loose insert the width of the tread portion of the wheel. Finding the patent for such insert valid, infringement is shown, and will be so adjudged.

What we call type No. 2 shows the use of a loose insert, but which not only covers the tread, but extends to the outer edges of the rail. In prosecuting his patent, Lange avoided certain reference, where an insert was shown of this greater breadth, and, having obtained his claim with the limitation of

---

[1] 1. A method of uniting railway rails, which consists in inserting between the head portions only of the rails an intermediate piece of metal, of such width as to extend across that part only of the heads of the rails which are subjected to wear by the car wheels, and of a character corresponding to that of the metal from which the rails are formed, and then fusing said intermediate piece of metal together with the rail ends.

2. A method of uniting railway rails, which consists in inserting between the head portions only of the rails an intermediate piece of metal of such width as to extend across that part only of the heads of the rails which are subjected to wear by the car wheels, and of a character corresponding to that of the metal from which the rails are formed, and then filing up the remaining part of the space between the rail ends with liquid iron.

3. A method of uniting railway rails, which consists in inserting between the head portions only of the rails, an intermediate piece of metal of less width than the head of the rail, and then pouring liquid metal into the space between the rails not occupied by said metal piece, whereby said metal piece is fused in position, and the web and foot portions of the rails, as well as the outer parts of the head portions of the rails, are fused directly together by the liquid metal.

"an intermediate piece of metal of such width as to extend across that part only of the heads of the rails which are subjected to wear by the car wheels," he cannot now contend that his claims be, by construction, extended to cover inserts from which he differentiated his device in order to obtain his patent.

In type No. 3 the gap between the abutting heads of the rails is not filled by an insert, and therefore the elements of the claims, "inserting" at that point "of an intermediate piece of metal" simply, are not found in type No. 3 of defendant's welding. The words "insert" and "intermediate" cannot be shorn of their common, well-understood meaning, which is that given two separate objects divided by a gap; the "insertion" or setting in the gap of an "intermediate" object simply means what it says, the use of three things, the two objects which form the gap and the one which fills it.

We have not overlooked the contention, strongly made, that the defendant undercuts the rail head by shearing off a part of the web and base of the rail, and that the protruding lip of the one rail is the equivalent of Lange's insert. To so hold is to our mind to lose sight of the fact that his insert was what procured Lange's patent. His disclosure was to insert, and insert between two intermediate rail heads. As we have shown, his disclosure had three elements. The defendant discards the insert, and uses the two abutting rail heads only. Shearing away the web and base of the rail by this undercut, or cut under the rail head, still leaves the projecting rail head abutting against its opposing rail head, with no insert inserted to

25 F.(2d)—14

fill the gap between them. To hold no insert the equivalent of a claim specified insert is to make the patent a noninsert disclosure, which it did not disclose, and which the public would not have enjoyed when Lange's patent expired. Wherever this undercut method originated, or whatever be its merits, certain it is that Lange did not disclose it, and give it to the art. Such being the case, type No. 3 will be adjudged not to infringe.

[2, 3] In view of the necessary length of the foregoing opinion in discussing this most important patent, we limit ourselves to saying, without discussing the minor patents, that we find the preheating patent, No. 900,366, granted October 6, 1908, to Goldschmidt and Felix Lange for a process for uniting metals, shows mere mechanical improvement, not an inventive step, and is therefore invalid. In that conclusion we find ourselves in accord with and supported by the line of reasoning followed in Falk v. Missouri (C. C. A.) 103 F. 295.

In view of the full and satisfactory discussion by the court below of patent No. 1,075,709, granted October 14, 1913, to Hans Goldschmidt, for manufacture and use of ferroso-ferric oxide, we shall not restate the grounds, proofs, and reasons leading to the court below finding said patent valid and infringed, but, by reference to the court's opinion in that regard, adopt the same and affirm its holding that said patent is valid and infringed.

The case will therefore be remanded to the court below, to modify its decree in accordance with this opinion; the costs in both courts to be divided.