Booth, Chief Justice,
delivered the opinion:
This is a patent case. The litigation involves an alleged infringement of two patents and was instituted by the filing of separate petitions as to each patent. Subsequently the cases were consolidated and are now to be disposed of upon one record and in one opinion. Case #34644 relates to Letters Patent #1316296, issued to the plaintiff on September 16, 1919, for a high-explosive projectile and method of using the same. Application for this patent was filed by the plaintiff on May 11, 1917. The invention, as ex *709 pressed in the specifications and illustrated embodiments, was directed to an improvement in a high-explosive shell adapted to be fired from what is known as a subcaliber gun. During the pendency of the application in the Patent Office action upon it was withheld under the act of October 6, 1917 (40 Stat. 394). This statute, among other things, provided that—
“When an applicant whose patent is withheld as herein provided and who faithfully obeys the order of the Commissioner of Patents above referred to shall tender his invention to the Government of the United States for its user he shall, if and when he ultimately received a patent, have; the right to sue for compensation in the Court of Claims', such right to compensation to begin from the date of the use of the invention by the Government.”
Jurisdiction is asserted and conceded under the foregoing act, the defendant admitting an observance of secrecy by the plaintiff and a tender of the patent as the act required. The defense is predicated upon other grounds.
The invention conceived had for its object the construction of a projectile or shell especially adapted for use in the destruction of submarines during a war. Plaintiff’s original application, filed May 11, 1917, embraced nine specific claims, which were limited to a structure involving a cylindrical member or cage of specific diameter, adapted to receive by insertion an explosive container, the cage or cylindrical member being provided with a base or shock plate and mounted upon a stem projecting rearwardly from said plate, the stem being of subcaliber diameter adapted to be loaded into the muzzle end of a gun of sub-caliber diameter for firing the shell. Without specifying in greater detail at present, it is obvious from the specifications and claims as originally framed that the inventor had in mind the construction of a shell adapted to segregation into parts for the important feature of safety in transportation and storage, and which might be readily assembled for use when needed. We say this not only in view of the prior art but for the additional reason that the *710 inventor himself used this language in his specifications, viz:
“A more detailed object is to so construct the parts of the shell that they may be stored in disassembled relation and readily assembled for firing when occasion demands. For example, the chamber carrying the high explosive may be detached from other parts of the shell, permitting storage of the explosives in places especially designed for the purpose and storage of the other parts in any other convenient places.”
On or about November 1, 1917, the plaintiff paid the final fee in the case. He did not, however, receive at this time a grant of the patent, because the Commissioner of Patents on December 5, 1917, gave the notice of secrecy authorized by the act of October 6, 1917, and this was followed by similar notice from the Federal Trade Commission as the act required. On March 8, 1918, the plaintiff tendered in writing the use of his invention to the United States. The ofiicials of the United States acknowledged the receipt of the tender, but denied use of the invention. Later, on December 5, 1918, following the armistice, the Commissioner of Patents rescinded the order of secrecy, and on January 15, 1919, the plaintiff, instead of pursuing the usual practice in such cases, wrote to the Patent Office, withdrew the final fee he had previously paid, and allowed the case to forfeit. About six months later, July 21, 1919, the plaintiff renewed his former application by the payment of a new filing fee, which enabled him to further prosecute his application, and then prosecuted the case to a finality. It was, as is to be especially noted, during this last period of activity upon the part of the plaintiff that claims 10, 11, and 12 had their birth, they being now the only claims relied upon to sustain the alleged infringement, and which were not included in the original application of the pat-entee. The patent in suit was issued to plaintiff on September 16, 1919. The structure relied upon is graphically illustrated by the following figures taken from the letters patent:
*711 [[Image here]]
Claims 10 and 11 are directed to specific structure of the subcaliber shell and are as follows:
“ 10. A projectile of the class described, comprising a holder for an explosive container, a shock plate to which said holder is secured and having a seat for the container, a stem projecting from the rear of such shock plate, said stem being of subcaliber cross section relative to the shock plate, and adapted to be loaded in the muzzle end of a sub-caliber bore gun for imparting velocity to the projectile, and an independent relatively large container for explosive material formed to seat on the shock plate, and means whereby the said container for explosive material may be removably secured by the holder against the said shock plate, for support thereby during assembly, projection, and night of the shell.
“ 11. A projectile of the class described, comprising a shock plate having its forward face formed to receive a container, a stem projecting from the rear of said shock plate, said stem being of subcaliber cross section relative to the cross section of the shock plate, and adapted to be loaded in the muzzle end of a gun of subcaliber for projecting the shell, and an independent self-contained container of *712 large volumetric capacity for explosive material formed to seat removably on said shock plate for support thereby during assembly, projection and flight, and means to retain said container on the shock plate.”
The above claims relied upon, if susceptible of the broad construction contended for and not anticipated by the prior art, may, we think, without doubt be read upon and applied to the Government structure, which is illustrated by the following drawing:
[[Image here]]
The plaintiff’s concept of an improvement in high-explosive shells centers around the accomplishment of means adapted to carry a large charge of high explosive of the type of torpedo or aerial shells, which may be discharged from light smooth-bore guns capable of being mounted on an ordinary merchant vessel and safely stored and transported thereon. It is conceded that a bursting shell projected from a subcaliber gun under the form of construction specified attains a low velocity, and its effectiveness as a destructive force lies in the fact that it will by direct hit destroy a submarine and is also available within a limited area to cause disruption of the submarine mechanism and either sink it or force it to the surface of the water, where it may be destroyed.
The plaintiff was not the first to enter the field brought into being by extensive submarine warfare during the World *713 War, and beyond question the essential elements to be employed in any form of shell construction were old in the art. The most that he could hope to accomplish was a unique and novel form of construction, effectively operative and so designed as to differentiate it from others previously patented and used.
The plaintiff’s original application filed May 11, 1917, contains, as before observed, nine specific claims limited by their terms to a design employing a specific type of “ cage ” of relatively larger caliber diameter than the explosive “ container,” the former adapted to receive and retain the latter in its flight following projection from a subcaliber gun. Obviously the patentee attributed usefulness and novelty to this “ cage ” as an effective means of retaining and securing the explosive container to the rearwardly projecting stem, which operated to obtain the propelling force of the subcaliber gun. It is the one vital, essential retaining means which the specifications and claims disclose. No other means of accomplishing the purpose was either shown or claimed, and surely it did not involve invention to conceive the necessity for the employment of a retaining means in the art involved. We say this because we find confirmation of the facts in that no infringement claim is predicated upon these claims in plaintiff’s original application. In 1919, when the war was over and the use of both defensive and aggressive ordnance in its prosecution must have been known to those skilled in the art, we find the original application and claims of the patentee extended by the addition of three new claims — now relied upon for infringement — in which for the first time a claim is set forth sufficiently broad to embrace any type of “ holder.”
The defendant did use an explosive shell retained by adaptable means to a subcaliber stem which was introduced in and propelled from a subcaliber gun, but no “ cage ” or other holding device of similar specific construction was employed. The explosive shell was attached to the stem and shock plate by means of clamps as appears from the illustration cited. It was, as one witness put it, of tin-can shape, exploded by hydrostatic pressure.
*714 PRIOR ART
Subcaliber projectiles were old and well known and tbe art was a crowded one prior to 1917 and 1919. A patent to one Garrick, issued June 17, 1884, discloses a stem member adapted for insertion into the bore of the gun, the outer end of this stem being enlarged into a cylindrical holder which is adapted to snugly receive the projectile or shell itself. The shell was filled with a high explosive, and a block of wood or other elastic substance was inserted at the base of the projectile as a shock plate. Garrick’s specifications also recite that the shell may be either spherical or elongated and also contain a safety clause, as follows:
“ This secondary projectile B may be made in sections, if desirable, which may be keyed together or screw-threaded in the ordinary or any suitable manner. This is done for the purpose of facilitating the transportation of the projectiles, * *
The plaintiff points out that the Garrick patent discloses no holder, no shock plate, and no relatively large container for high explosive material, and also no separability. The inventor, however, pointed out in his specifications means of making the secondary projectile separable, as we have cited above, and clearly a shock plate was utilized.
The patent to Louis Gathmann, #511418, issued in 1898, is also illustrative of the early knowledge possessed by those skilled in the art with respect to this type of projectile. This patent discloses a projectile of the subcaliber type made in three separable portions. The' stem, which is adapted to fit into the bore of the gun, carries at its front end, in screw-threaded engagement, a coupling member which has the function of a shock plate. This coupling member, in turn, is adapted to be fastened on the * rear end of the front section which contains high explosive. The specification indicates the advantages of separability, in the following language (p. 1, lines 42-51), and which is almost synonymous with the object stated in the patent in suit:
“By making such sections of the projectile separable it will be noted that the front section can be filled with some explosive, such, for instance, as wet gun cotton, so that the *715 high-explosive charge can be kept separate from the rest of the projectile and thus reduce the danger from accidental explosions or from fire, which is especially desirable in carrying such charges in vessels.”
Reference is also made to patent to Wieser, #932214, of August 24, 1909. This also discloses a projectile of the sub-caliber type having the usual stem for insertion into the bore of the gun, the stem carrying a shock plate and spherical projectile at its outer end. The specification is silent as to whether the shock plate is fastened to the projectile or to the stem.
British patent to Hale, #26764 of 1911, embodies all of the elements of claim 11. This patent discloses a projectile of the subcaliber type having a stem adapted for insertion into the gun barrel, the stem carrying at its outer end a grenade or shell filled with high explosive.
Referring to Figs. 7 and 11, which we reproduce, it will be seen that the outer end of the stem is screw-threaded and is adapted to fit into a cylindrical block. A set screw is shown in Fig. 7 as providing additional locking means for fastening the block on the end of the stem. The upper end of the block has a recessed portion which is screw-threaded and 'which is adapted to screw in or to engage with the rear of the projectile, this screw-threaded engagement providing means for holding the projectile or container for high explosive onto the block which has the functions of a shock plate.
There are numerous additional references in the record, made part of the findings by reference, from which it is indisputable that room for invention in the art was circumscribed within very narrow limits. The functioning elements essential to the desired end were well known, and about all that was left for the inventive faculty was to unite them in some novel way to produce a new result. The plaintiff, stressing its constructive elements, very properly points out that anticipation must be predicated upon the presence of a holder, a shock plate, and means whereby the container for explosive material may be removably secured by the holder against the shock plate. As a matter of fact, it would be difficult to conceive of a form of construction *716 which did not embody all or practically all of the above elements, and it is a matter of extreme doubt whether the ge *717 neric term “ holder ” may be held to embrace every conceivable form of device intended for the purpose of holding. Aside from this, however, we think the prior art, and especially the Hale patent just referred to, clearly discloses anticipation in so far as claim 11 is concerned, and that it has not been infringed because of invalidity.
*716 [[Image here]]
*717 CLAIM 10
This claim differs from claim 11 in that it specifically recites as an element “ a holder for an explosive container ” and in the last element of the claim “ means whereby the said container for explosive material may be removably secured by the holder against the said shock plate, for support thereby during assembly, projection, and flight of the shell.” The British patent to Hale just referred to also meets the terms of this claim.
Reference is again made to Garrick patent #300592, of 1884. The Garrick patent describes the relationship of the high-explosive shell with a holder, or chamber in which it is inserted, in the following language:
“ E is the enlarged front end of the projectile B, provided with the longitudinal chamber F, in which rests snugly the shell G, which may be either spherical or elongated in shape, and to the front end of which is fixed the fulminating-cap H.”
Figure 1 of the Garrick patent is illustrated herewith:
[[Image here]]
*718 Previous reference has been made to the disclosure of the Garrick patent as suggesting separability of the holder from the stem. If with such separability present a set screw were utilized in the Garrick patent to hold the high-explosive container in the holder or chamber F, there would exist practically the exact mechanical counterpart of the Gathmann structure. Instead of a set screw, Garrick suggests a snug -fit of the shell in the holder. A fitting of two mechanical elements tightly or snugly together so as to utilize friction in holding them in assembled relationship and holding the two parts in assembled relationship by means of a set screw, which is but another manifestation of friction, are mechanical equivalents for accomplishing the same purpose. Both of these means are almost prehistoric in the mechanical arts, and certainly in the present instance one does not involve the use of the inventive imagination over the other. It is true that in the Garrick specification the snugness of the fit is of such a degree that the projectile G may leave the container during the flight of the entire projectile toward the target. This is but a question of degree, however, with respect to the amount of friction used or the snugness of the fit of the projectile G in the holder F, and patentability can not be predicated upon merely changing the degree of frictional relationship between these two parts so that they are in assembled relationship during the entire flight of the entire projectile, such as is suggested, for instance, in the prior art patent to Gathmann, #511418, or the British patent to Hale, #26764, of 1911. No patentable novelty can be found to exist in claim 10, and we think it invalid in view of the prior art.
METHOD, CLAIM 12
This claim is directed to a process or method for destroying submarines. The claim is as follows:
_ “ 12. The herein described method of destroying submarine vessels which consists in confining large masses of high explosive in air and water proof containers,. and in projecting the same by explosive charges located remote therefrom. wherebv the high explosive is not confined save by *719 its own container and whereby it is removed from the vicinity of the projector into the vicinity of the submarine vessel, and in detonating said high explosive when submerged to produce torpedo or mine effects on the hull or material of said vessel.”
Defendant attacks this claim on the ground that it is not a legitimate method claim, but rather expresses the function of a mechanism. Robinson on Patents, in volume Í, p. 230, defines an art or method as follows:
“An art or operation is an act or a series of acts performed by some physical agent upon some physical object, and producing-in such object some change either of character or of condition. It is also called a ‘ process,’ or a £ mode of treatment ’; and is said to require that ‘ certain things should be done with certain substances in a certain order.’ It is so far abstract that it is capable of contemplation by the mind apart from any one of the specific instruments by which it is performed. It is so far concrete that it consists in the application of physical force through physical agents to physical objects, and can thus become apparent to the senses only in connection with some tangible instrument and object.” (Italics inserted.)
It is doubtful if the present claim under consideration can be contemplated apart from an explosive shell and a gun to fire such projectile. A method claim involving a series of steps or operations must have the essence of invention not only in the nature of the individual steps or acts but also in their relationship to each other, and in the method in which they cooperate in the production of a joint result. Claim 12 of Gathmann is lacking in this and is drawn to what might be termed an aggregative method claim. No interdependence is found between “removing the container of high explosive from the vicinity of the projector ” and “ exploding or detonating the high explosive when submerged in the vicinity of the submarine.” These two steps are independent and the shell or container would function to destroy the submarine with equal facility were it placed in the vicinity of the submarine by being tossed overboard from a destroyer or if it were projected from a gun on a destroyer.
*720 A still more serious difficulty exists in connection with claim 12, in that the claim specifically sets forth as a step “ detonating said high explosive when submerged to produce torpedo or mine effects on the hull or material of said vessel ” (i. e., the submarine). The method set forth inferentially includes a delayed-action fuse or detonator instead of an impact fuse or detonator which would cause an immediate explosion of the projectile as soon as the shell contacted with water, with a resultant surface explosion. No disclosure of such delayed-action fuse is found in the Gathmann patent #1316296. Gathmann states, page 2, line 7, “ The details of construction of the detonator, however, form no part of the present improvements.” It is trae that Gathmann states that a fuse structure may be used of the type described and illustrated in his copending application (see line 102, page 1) and his copending application #167956 disclosed a fuse having a delayed action, but no reference either by filing date or serial number is made to the copending application and therefore the disclosure of such delayed-action fuse to the reader of the present specification is not made.
The plaintiff is thus placed upon the horns of a dilemma. With the exception of the delayed action and underwater explosion, the method defined by claim 12 would be carried out whenever Garrick or Gathmann of the prior art fired their subcaliber projectiles at a submarine. If the patent-ability of this claim is predicated upon the only distinction left, the delayed action of the fuse, the plaintiff is without foundation in his specification for such distinction, and the claim is broader than the original disclosure. If, on the other hand, the view is taken that delayed-action fuses were old and well known in the ordnance art and that it is a mere mechanical expedient to utilize one, and that therefore the plaintiff could suggest such use in his method claim, although not disclosed in his specification, the position must then be taken that such delayed-action fuse would be used with the subcaliber projectile of Garrick or Hale with equal facility, and the claim would then be directed to an unpatentable method in view of the prior art.
*721 Eeferen.ce is also made to the patent to McCombie, #910942, patented January 26, 1909. This patent discloses a projectile adapted to be fired from a gun for the purpose of producing a mine effect in the destruction of vessels and submarines. We quote herewith from page 1 of the McCombie patent:
“ This invention has reference to explosive mines or projectiles used in naval warfare for the purpose mainly of destroying enemies’ ships or vessels; and it has primarily for its objects and effects, among others, to provide an explosive mine or projectile which can be thrown through the air for a long distance accurately, and when exploded will act similarly to a mine or torpedo on a ship or vessel, whether such vessel be an ordinary warship, cruiser, or other surface craft, or a submarine vessel. According to this invention, this explosive mine or projectile is so constructed and adapted externally, that it can he -fired from a gun above water in the ordinary manner of a projectile, towards the ship or vessel it is intended to destroy; and when it reaches the vessel, or strikes the water, it will sink, and expel an explosive, or a container containing an explosive, which sinks, or it will sink as a whole, and when sunk to the required or predetermined depth, either by an automatic timing fuse or means, or by a ship or object coming in contact with it, will explode and act as a mine." (Italics inserted.)
In view of the prior art, it certainly would not require the use of the inventive faculty to discharge the McCombie projectile from a subcaliber gun, or to provide the projectile of Garrick with a delayed-action fuse and to discharge the projectile of Garrick at a submarine.
In view of what has been said, it is impossible to sustain the claim as valid.
The defendant interposes an additional defense which we think worthy of consideration. We have heretofore noted the filing date and pendency in the Patent Office of plaintiff’s original applications for patents and the payment of final Patent Office fees upon his allowed claims November 1, 1917. Subsequently, to repeat, on December 5, 1917, the order of secrecy was promulgated and obeyed, and this event followed by the written tender of use to the United States. *722 (Findings IV, V, VI, VII, VIII, IX, and X.) The written tender specifically states the serial numbers of plaintiff’s applications and recites that it is a tender of allowed but withheld from issue applications, for the use of which compensation would be expected either in a lump sum or upon a royalty basis. The applications allowed as of this date did not contain the claims now sued upon and no contention is advanced or claimed that infringement obtains as to them. After the war was over, in January, 1919, the plaintiff withdrew the final fees previously paid and permitted both of his applications to forfeit for nonpayment of the final fee. Later on, in July, 1919, the plaintiff renewed both of his applications by paying new filing fees, and in the prosecution of his applications added to his previous nine claims, the -claims 10, 11, and 12, the only ones involved in this suit. It is therefore apparent that during the war, subsequent to the date of tender, the United States did not use any projectile that infringed in any particular the type of construction specified in the allowed claims of the original applications of the plaintiff which had been prosecuted to a finality. The secrecy order and the proceedings incident to governmental rights under the war-time act of October 6, 1917, accomplished a dual purpose. It protected the inventor and it protected the Government. Neither party was to lose rights and, while no challenge is advanced as to the legality of the proceedings had, it does seem clear that the intervening rights of the Government were not lost by the secrecy law. The applications in this instance had been allowed, the final fee paid, and all that remained to be done was to issue the patent. The applications had passed beyond the plastic or formative state in the Patent Office, and to all intents plaintiff had completed carving out the monopoly he desired. The tender for use disclosed claims more specific than those added to the applications after the war was over, and at a time when broader claims might easily be extended to cover past user. The secrecy law did not forestall the prosecution of applications in the Patent Office. It did not dispense with the established procedure. (67 C. Cls. 1, 32.) It simply made it possible to invoke secrecy and at the same *723 time preserve to the inventor his right of action in the event of Government user during the secrecy period, and save for the order of secrecy and the withholding of issue of the patent as disclosed in the original application what was done could not have been done except under the reissue statutes. (Sections 4895 and 4916 of the Revised Statutes.) Unquestionably the plaintiff in his orginal application obtained claims commensurate' with his idea of the scope of his invention. His specifications depict the structure he conceived and his claims were stated in accord therewith, and the claims thus limited were disclosed to the defendant in the tender for use made by the plaintiff. The defendant responded by disclaiming use or intent to use a structure covered by these claims, and it is not now claimed nor has it ever been asserted that the original and first allowed claims of the patent in suit may be read upon the structure used by the defendant. Under these circumstances courts scrutinize with care claims for infringement when obviously no such suit is tenable prior to their coming into the patentee’s application.
We need but state the rule that an inventor dedicates to the public everything which he does not claim as a monopoly, and that he should not be permitted to thereafter enlarge his monopoly to the prejudice of intervening rights. The cases we cite relate to reissues, but the principle seems apropos and applies with force to the instant case. (White v. Dunbar, 119 U. S. 47; Milloy Electric Co. v. Thompson-Houston Electric Co., 148 Fed. 843, 847; and Ashland Fire Brick Co. v. General Refractories Co., 27 Fed. (2d) 744.) In the case at bar we have a record proving the fact that the defendant with positive knowledge of the scope of plaintiff’s original monopoly admittedly does not use it, and, after user of a projectile in no way infringing plaintiff’s patent and after the occasion for user has ceased to exist, additional claims are inserted in the patent application of such-broad and comprehensive scope as to impose, if valid, a liability upon the defendant for doing what all the facts warrant us in saying is an apparently innocent thing. In case of reissue the rule is clear and the defendant would be *724 protected from infringement. Therefore, inasmuch as the secrecy law seemingly could not have prejudiced plaintiff’s patent rights to any greater extent, as shown herein, than imposing secrecy and withholding issue, the case we think falls within the principle heretofore discussed. The defendant sedulously insists upon this defense, but aside from it and its merits we would be loath to ascribe to the claims involved, even if valid, the scope claimed for them.
CASE NO. 34643
Considering now case No. 34643 with reference to the same patent, which deals with alleged infringement subsequent to its issuance as a patent, it is also obvious that no recovery can be had, due to the fact that claims 10, 11, and 12, the claims sued upon, are invalid. In addition to this, however, no active use subsequent to the issuance of Letters Patent #1316296 on September 16, 1919, has been proven. There is no evidence of utilization or use of “ Y ” guns or depth bombs for the destruction of submarines subsequent to the date of the armistice or of manufacture of depth bombs subsequent to September 16, 1919.
PATENT #1340536
The application which materialized into this patent was also filed on May 11, 1917. The invention disclosed in this patent has reference to a detonator or fuse structure to be used with high-explosive shells, and it is more specifically directed to a construction designed to give safety and prevent a premature explosion of the high explosive in the shell until the shell has traversed an initial portion of its path toward the target. This is accomplished by the ultili-zation of an air screw or w,ind vane carried by the shell and which is adapted to revolve as the shell passes through the air. The rotation of the wind vane or propeller acts to move a detonating charge from a safety chamber, where a premature explosion of the detonator will be harmless, into a firing position in intimate proximity with a priming charge. In this latter position an explosion of the detonator *725 will be communicated to tlie priming charge, with its consequent explosion, which in turn will be communicated to the high explosive material in the shell itself. The wind vane in addition operates to bring the firing cap for igniting the detonator into operative association with a firing pin carried on a weighted member. The latter functions to fire the cap when the velocity of the shell is suddenly altered by impact.
The Patent Office history of the Gathmann application which materialized into this patent is substantially similar to the history previously given in connection with Gathmann patent #1316296. Both applications were filed on the same date and on September 25, 1917, the present application was allowed after a prosecution in the Patent Office, resulting in the series of claims expressed .in Finding II, which had been solicited by plaintiff as expressing his patent monopoly. On November 1, 1917, plaintiff paid the final fee in this application in this case and under date of December 5, 1917, the commissioner gave plaintiff the usual notice of his patent being withheld under the provisions of the act of October 6, 1917. In the same letter to the Secretary of the Navy under date of March 8, 1918, previously referred to in connection with Gathmann patent #1316296, the plaintiff made his tender to the Government, which was duly acknowledged, with the statement that no reasonable grounds had been found for assuming that the Navy was making use of plaintiff’s devices.
No question of tender or observance of the secrecy order is at issue with respect to this patent. After the armistice a rescinding order was issued by the Commissioner of Patents in this application, and on or about January 15, 1919, plaintiff wrote to the Patent Office and withdrew the final fee previously paid, thus allowing the case to forfeit. Plaintiff then, on July 21, 1919, renewed the application by the payment of a new filing fee, and then proceeded to prosecute the case to a finality, during which prosecution the present claims 7 to 13, alleged to be infringed, were inserted. The application was allowed and the present pat *726 ent, #1340536, was issued on May 18, 1920. A specific embodiment of the patent in suit and the Government structure alleged to be infringed are inserted herewith and each will be described briefly.
[[Image here]]
In the specific embodiment of the patent, shown above, an annular priming cup or chamber surrounds a central tubular portion. In the lower end of this central tubular chamber a weight member F is located, the same being provided with a firing pin f at its upper extremity. Located above the priming chamber and separated therefrom by a thick wall or barrier 51 is a safety chamber, which may be vented to atmosphere through a plurality of vents c. A detonator carrier D is provided, which is movable axially in the central chamber. This carrier D carries at its mid portion an an *727 nular detonating charge E and at its lower end carries a firing cap G, which communicates with the detonating charge through a central inner passage H. With the carrier in the position as shown, the detonating charge E is located in the upper or safety chamber, and the firing cap G is remote from the firing pin †. If the detonating charge were prematurely exploded in this position, the explosion would take place in the upper or safety chamber and its effects would be dissipated through the vents to atmosphere. The upper end of the carrier is screw-threaded and engages with a screw-threaded opening in the nose or top of the fuse. At the extreme upper end of this screw-threaded portion the wind vane L1 — L1 is fixed. A means is provided for locking the carrier in the safety position shown, which means comprises a split locking ring K locked to the top external portion of the carrier by a manually removable cotter pin h. Manual removal of the cotter pin just prior to using the shell equipped with this fuse structure renders the upper screw-threaded portion of the carrier D free to rotate under the action of the wind vanes L1 — L1 as the shell moves on its path toward the target. Eotation of the screw-threaded portion causes the carrier D to move axially downward in the central tubular member, which movement carries the detonating charge E from the position in the upper chamber and above the barrier wall as shown into a position below the barrier and within the priming-charge chamber. At the same time the cap G, which is mounted upon the lower end of the carrier D, is brought into operative position with respect to the firing pin f.
In August or September, of 1918, the Govermnent began to use what was known as a Mark VI fuse for bombs intended to be dropped from airplanes. This mechanism is illustrated, supra, and in numerous respects is similar to plaintiff’s structure. lieferring to the above illustration, the Government fuse structure comprises a tubular member of uniform diameter adapted for insertion as a unit in the nose of the bomb. In the bottom of this tubular member is located a priming charge chamber B. This is neither fastened nor fixed in the bottom of the tubular member *728 but is resiliency mounted by means of a spiral spring between it and the lower end of the tubular member. The top of this priming charge container has a central recessed portion C1 of relatively small cross-sectional area which extends inwardly. The outer end of the tubular fuse container is provided with a cap having a bearing for a rotatable shaft, carrying at its outer end a propeller or wind vane L1 which acts to rotate the shaft as the bomb passes through the air on its way to the target. The inner portion of the shaft D is screw-threaded and engages with a longitudinal movable member or carrier, which carrier supports at its lower end the detonating charge E and a series of caps T — T which are actuated by a plurality of firing pins S — S. The caps communicate with the detonator through a series of channels in the carrier member. An impact block or firing hammer is located above the carrier member and in the safety position is also engaged by the screw-threaded central rod D. This rod is normally prevented from rotating by a locking finger F, which engages the propeller blades and locks them against rotation. This finger is held in the locking position by means of a cotter pin P. When it is desired to drop the bomb from the airplane or airship the cotter pin P is manually removed and as the bomb descends on its trajectory toward the target the air operates the wind vanes or propeller, rotating the screw-threaded rod and moving the detonator carrier from the safety position shown in an axial direction with respect to the fuse container so that the detonator E is brought into proximity with and enters the depression C1 in the top of the priming chamber. A still further rotation of the screw-threaded rod then releases the firing hammer or block with respect to the detonator carrier so that the two are capable of relative movement with respect to each other upon impact of the bomb upon the water. Such relative movement will cause the firing pins to ignite the caps, which will cause a passage of flame to the detonator and when in this position will explode the primer, and the main explosive charge of the bomb will then be exploded.
This type of fuse was made and used with the channels shown in the above illustration, filled with a delayed-action *729 fuse. In addition, two other caps and firing pins not shown in the sectional illustration were used, these latter firing pins being shorter and the channels from their caps being open so that an impact of an extremely violent character would cause all four of the firing pins to actuate their corresponding caps, resulting in an immediate explosion instead of a delayed explosion.
With the fuse inserted in the bomb as shown, an explosion of the detonator when in a safety position would be at the upper end of the detonator chamber and the force of its explosion would be dissipated, due to the relatively large size of the chamber in which it was located and its remoteness from the priming charge.
The claims in suit are claims 7 to 13, which are paraphrased as follows:
Claim 7: A detonator for high-explosive shells embodying—
(1) A priming charge chamber,
(2) An elongated detonating charge chamber having ends of unequal cross-sectional area and with the end of the smaller area located within the walls of the priming charge chamber and the end of the larger area exterior to the walls of the priming charge chamber,
(3) A detonating charge carrier mounted in said chamber and movable to carry the detonating charge from the end of larger area into the end of the chamber or smaller area, and
(4) A barrier normally separating the detonating charge from the priming charge,
(5) A member detachably associated with said carrier and located beyond the outer walls of said detonating charge chamber in the exterior air for operatively locking and unlocking said carrier with the detonating charge within the end of the chamber of larger area, and
(G) A mechanism for igniting the detonating charge when the shell reaches its target or objective.
Claim 8: A detonator for high-explosive shells embodying—
(1) A priming-charge chamber,
(2) An elongated detonating-charge chamber, having ends of unequal cross-sectional area and with the end of *730 the smaller area located within the walls of the priming-charge chamber, and the end of the larger area exterior to the walls of the priming-charge chamber,
(3) A detonating-charge carrier mounted in said chamber, and
(4) A member detachable from the said carrier and located beyond the outer walls of said detonating-charge chamber in the exterior air for operatively locking and unlocking said carrier within the end of the chamber of larger area, and
(5) A mechanism for igniting the detonating charge when the shell reaches its target or objective.
Claim 9: A detonator for high-explosive shells embodying—
(1) An elongated detonating-charge chamber having ends of unequal cross-sectional area and with the end of the smaller area located within the walls of the shell, and the end of the larger area extending to the exterior of the walls of the shell,
(2) A detonating-charge carrier mounted in said chamber and having—
(3) A member projecting beyond the outer walls of said detonating-charge chamber into the exterior air with removable
(4) Means cooperating therewith for operatively locking and unlocking said carrier within the end of the chamber of the larger area,
(5) A delay action fuse, and
(6) A mechanism for igniting the same when the shell reaches its target or objective.
Claim 10: The combination with a high-explosive shell, of a detonator mounted at the forward portion thereof, embodying—
(1) An elongated detonating-charge chamber having its end portions of unequal cross-sectional area.
(2) A priming charge located around the chamber portion of the smaller area,
(3) A carrier for a detonating charge movable in the detonating-charge chamber from its portion of larger area to its portion of smaller area, and
(4) Manualh/ detachable means associated with the detonating-charge carrier and located on the exterior of the detonator for normally locking the detonating-charge car *731 rier to hold the detonating charge within the portion of the detonating-charge chamber of larger area.
Claim 11: The combination with a high-explosive shell, of a detonator mounted at the forward portion thereof, embodying—
(1) An elongated detonating-charge chamber having its end portions of unequal cross-sectional area,
(2) A priming charge located around the chamber portion of the smaller area,
(3) A carrier for a detonating charge movable in the detonating-charge chamber from its portion of larger area to its portion of smaller area, and
(4) Manually removable means associated with the detonating-charge carrier and located on the exterior of the detonator for normally locking the detonating-charge carrier to hold the detonating charge within the portion of the detonating-charge chamber of larger area, and
(5) Means for obtaining delay ignition of the detonating charge when the shell reaches its target or objective.
Claim 12: A detonator for high-explosive shells or like bodies of the class described comprising—
(1) A priming-charge chamber adapted to be firmly secured within.the bursting-charge chamber of the shell,
(2) An elongated detonating-charge chamber having ends of unequal cross-sectional area and with the end of the smaller area located within the walls of the priming-charge chamber and the end of larger area exterior to the priming-charge chamber,
(3) A detonating-charge carrier mounted in said detonating-charge chamber and movable from the larger into the smaller end thereof,
(4) A member detachably connected with said carrier and located beyond the outer walls of said detonating-charge chamber in the exterior air for operatively locking or unlocking said carrier in a position normally locating the detonating charge within the end of the chamber of larger area, and
(5) A mechanism for igniting the detonating charge when the shell reaches its target or objective.
Claim 13: A detonator for high-explosive shells or like bodies embodying—
(1) A priming-charge chamber adapted to be firmly secured within the bursting-charge chamber of the shell,
*732 (2) A detonating-charge chamber having a part of its area remote and a part extending in proximity to the priming charge,
(3) A carrier for supporting a detonating charge in the detonating-charge chamber movable from a point remote to a point in proximity to the priming charge, and
(4) Detachable means located outside of the detonating-charge chamber operatively engaging with a detachable member engaging said carrier and likewise located outside of said chamber for normally locking the detonating charge at a position remote from the priming charge.
The phraseology of the claims, which include numerous stock patent phrases, such as “means cooperating with,” “ means associated with,” and “ having a member,” renders it necessary to first contemplate the prior art in order to determine the scope of claims, as the scope of a patent and the exact meaning of words and phrases in the claims may be ascertained by reference to the prior art.
See Spengler Core Drilling Co. v. Spencer, 10 Fed. (2d) 579; Goldschmidt Thermit Co. v. American Vanadium Co., 291 Fed. 81.
The prior art as exemplified by the art described in Findings XXIV and XXV is full of instances where detonator carriers are axially movable from a safety chamber to a. firing position in contiguity with a priming charge, and there are also several instances where wind vanes or propellers are used which have the function of unlocking or releasing the detonator carrier from the safety position. The use of delay-action fuses is also shown to be old.
One particularly pertinent prior art disclosure is the U. S. patent to Hale, #1141540, patented June 1, 1915. This patent was not issued two years prior to the original filing date (May 11, 1917) of the application which materialized into Gathmann patent #1340536. It nevertheless sufficiently antedates the first tests of Gathmann made in September or October of 1915 in connection with the development of his fuse and therefore becomes a valid reference as to prior disclosure. The patent to Hale discloses a high-explosive bomb adapted to be dropped from *733 an airplane or airship. Fig. 1 of the Hale patent is shown below.
[[Image here]]
*734 In this illustration the detonating carrier 3 is in the upper or safety position in the enlarged end of the elongated detonating-charge chamber in Avhich it is axially movable. It is normally locked or held in this safety position by the balls 4, 4, which are held in position by the lower end of the screw-threaded member 6, which carries at its upper end the wind vanes 10. The member 6 is prevented from rotating by the removable cotter pin 16, which is manually withdrawn just previous to dropping the bomb. As the bomb proceeds toward the target, the wind vanes 10 are rotated and unscrew the threaded member 6 releasing the balls 4 and unlocking the detonator, which is then free and movable to carry the detonating charge into the lower and small-diametered end of the detonating chamber and in contiguity with the firing charge.
The mechanism for igniting the detonator comprises the firing pin 8 and a cap on the lower end of the detonating-charge carrier.
British patent to Hale #22602 is quite similar to the United States patent, the main difference being that the detonator carrier is directly fastened to the screw-threaded spindle when in safety position by a spring catch, instead of using the balls as a lock as shown in the United States patent.
Claim 7 of Gathmann patent #1340536 is now considered. This claim specifies and includes as element (4) “ a barrier normally separating the detonating charge from the priming charge.” This barrier is identified in the plaintiff’s structure by the reference character b1 and is a heavy metal barrier separating the safety chamber from the priming charge chamber and having the function of isolating a premature explosion of the detonator in the safety chamber from the priming charge. No such equivalent structure is found in the Government construction. The top, as well as the side walls of the priming charge chamber in the Government structure, is made of relatively thin material. This is not intended to function, and would not function as does the heavy barrier wall b1 of plaintiff, to prevent an explosion of the priming charge should the detonator prematurely ex *735 plode. safety of the Government structure lies in the remoteness of the detonator from the priming charge when in the safety position and in the relatively large size of the tubular chamber in which the detonator is located.
Claim 7 is therefore not infringed.
Claim 8 is next to be considered. This claim specifies as the fourth element—
“(4) A member detachable from the said carrier and located beyond the outer walls of said detonating charge chamber in the exterior air for operatively locking and unlocking said carrier within the end of the chamber of larger area.”
In plaintiff’s structure the upper end of the detonator carrier is screw threaded and projects through the end of the fuse into the outer air, carrying fixed to its end wind vanes or propellers. The split locking ring K, which engages the exterior threaded portion of the carrier and which is detachable therefrom by the removal of the cotter pin K, is the “ member ” thus specified. The details of this portion of defendant’s structure differ in this respect from plaintiff’s structure in that defendant’s detonator carrier lies entirely and completely within the elongated detonating chamber, no portion being located beyond the outer walls of the detonator or in the exterior air. The screw-threaded spindle D of defendant’s device is a separate instrumentality from the detonator carrier. This spindle functions to release and free the carrier when actuated by the wind vanes at its outer end. In this respect the Government structure more nearly resembles the disclosure of the prior art Hale patent, which shows a detonator carrier completely inclosed within the elongated detonator chamber, with a separate screw-threaded member operated by wind vanes for unlocking the carrier.
Any attempt to enlarge the literal meaning of this portion of claim 8, by a liberal application of the doctrine of equivalents, would result in the claim being rendered invalid by the Hale disclosure, and patent claims that are ambiguous or capable of a broad and narrow meaning should be construed narrowly if they may therefore be held valid.
*736 General Bakelite Co. v. General Insulate Co., 276 Fed. 166, 170. Also Pacific States Electric Co. v. Wright, 277 Fed. 756.
Claim 8 is held not infringed.
Claim 9 is next referred to. This claim specifies as its first element “ an elongated detonating-charge chamber having ends of unequal cross-sectional area,” etc. In this connection defendant raises the issue that the Government does not use a “ detonating-charge chamber having ends of unequal cross-sectional area located within the walls of the priming-charge chamber and the end of the larger area exterior to the walls of the priming-charge chamber.” Defendant urges that its detonating-charge chamber is of uniform cylindrical cross section throughout. We do not agree with this. While the outer containing chamber or tubular member is of uniform cylindrical cross section, the indentation C1 in the end of the priming-charge chamber forms and has the functional equivalent of the chamber of small cross-sectional area, while the space C1 beyond it forms a chamber of larger cross-sectional area.
This claim also specifies the locking means in broader phraseology, referring to the detonating charge carrier as “ having a member projecting beyond the outer walls * * * with removable means cooperating therewith for operatively locking and unlocking said carrier * * This claim is not necessarily limited to a structure in which an integral portion of the carrier itself projects beyond the outer walls of the fuse casing, and therefore is readable upon defendant’s structure which has the screw-threaded member connected to the carrier and which projects into the exterior air and carries the wind vanes. This claim also defines the locking mechanism by the broad term “ means.” This claim is therefore readable upon defendant’s structure. At the same time, however, the claim with equal facility may be read upon the structure of the Hale patents in which the screw-threaded spindle also projects into the exterior air and in each of which a cotter pin cooperates with the screw-threaded member for locking and unlocking the detonator carrier. Claim 9 is therefore invalid, as the structure defined thereby is found in the prior art.
*737 Claims 10 and 11 may be considered together, as claim 11 differs from claim 10 merely in specifying that the fuse construction has means for providing for a delay action when the shell reaches its target or objective, and this feature is present in the Hale patents due to the fact that the spring, identified by the reference numeral 7 in the United States patent, normally holds the detonator carrier remote from the firing pin so that the detonator carrier has to travel through a certain predetermined distance after impact before the shell is exploded. The locking means in these two claims is defined as “ manually detachable [or removable] means associated with the detonating charge carrier.” Giving the term “ associated ” a reasonable functional interpretation these claims are readable upon defendant’s structure. They are equally readable upon the Hale patents with the exception that these claims specify that the detonator is mounted at the forward portion of the high-explosive shell. This is not considered a patentable distinction, however, in view of the fact that it is old and well known in the art to mount the fuse structure in the nose of the shell as well as in the rear of the shell. As a matter of fact, United States patent to Gathmann #672828 (defendant’s Exhibit 106) discloses nose mounting or rear mounting of detonators as alternative forms of structure, and the man skilled in the art could with propriety utilize the structure disclosed by the Hale patents in either position with but the exercise of mechanical ingenuity. In further amplification of this statement, attention is also directed to British patent to Armstrong, #11835 of 1914 (defendant’s Exhibit 113), which discloses a tubular detonating chamber quite similar to that of Hale but extending throughout the length of the shell, the priming charge being placed in the forward end. Attention is directed to page 2, lines 21 to 26, inclusive, which read as follows:
“A tube extends the length of the body, through which tube the detonating charge is capable of passing, and at the front end of the tube is a needle. The detonating charge is secured to the prolongation by bolts which are retained in position by a sleeve and on the prolongation is a rotatable *738 vane which as it revolves moves the sleeve and frees the bolts.”
Claims 10 and 11 are considered invalid over the prior art.
Claim 12 is closely similar to claim 8 in its definition of the locking means, referring to this as a “ member detach-ably connected with said carrier and located beyond the outer walls of said detonating charge chamber.” Giving this claim the same interpretation as was given to claim 8, the same is held not infringed.
Claim 13 specifies as an element “ a priming-charge chamber adapted to be -firmly secured within the bursting-charge chamber of the shell.” As has already been stated, the priming charge chamber of the Government structure is loosely or resiliently mounted in the bottom of the detonating charge chamber. The Government structure therefore does not come within the terms of claim 13 and does not infringe this claim.
Claims 7, 8, 12, and 13 are not infringed, and claims 9, 10, and 11 are invalid. The above applies with equal force in cases 34613 and 34644 relating to an alleged act of infringement both prior and subsequent to the issuance of patent #1340536. In addition, however, it should be again pointed out that in the prosecution of the application which resulted in the issue of patent #1340536 plaintiff followed the same practice fully discussed in connection with his patent #1316296 by withdrawing his final fee and prosecuting his case anew with broader claims than were first issued to him, and the serious question of intervening rights heretofore discussed is therefore also present with reference to the acts of infringement prior to the issuance of the patent, and upon which plaintiff bases his suit under the trading-with-the-enemy act of October 6,1917.
While not material, in view of the fact that all of the claims of patent #1340536 readable upon defendant’s structure are found invalid, reference is nevertheless made to the facts set forth in Finding XIX. While there is an evidence of bids being opened on Mark VI fuses on May 11, 1920, there has been no evidence produced to show actual *739 manufacture of Mark VI fuses subsequent to the issuance of patent #1340536 which issued on May 18, 1920.
The petitions will be dismissed. It is so ordered.
Whaley, Judge; Williams, Judge; Littleton, Judge; and Green, Judge, concur.